# Penn & Co. *v.* Smith, Grainger & Cantrell.

### *Action by Vendor against Purchaser of Goods.*

1. *Joinder of counts.*—A special count, claiming damages of the purchaser for his refusal to receive and pay for the goods bought, may be joined with the common counts for goods sold and delivered and on an account stated.

2. *Sale by sample.*—Where plaintiffs, who were mill-men, offered to sell and ship to defendants a quantity of flour of two named brands, at specified prices, exhibiting samples of each brand, and defendants then declined to buy, but sent an order by letter a few days afterwards for a car-load of each kind, specifying the brand and the price, but saying nothing as to the quality; held, that this was a sale by sample, and that defendants might refuse to receive the flour if inferior in quality.

3. *Measure of damages to vendor, on purchaser's refusal to receive and pay for goods.*—On the refusal of the purchaser to receive and pay for a car-load of flour sold and shipped to him, the seller may resell the flour at his risk, and recover as damages the difference between the contract price and the price brought at the re-sale; but he can not recover anything for his loss of time and expenses in coming out to make the sale.

[Penn & Co. v. Smith, Grainger & Cantrell.]

APPEAL from the Circuit Court of Lee.

Tried before the Hon. JESSE M. CARMICHAEL.

This action was brought by Smith, Grainger & Cantrell, suing as partners, against Penn & Co., or Penn & Montgomery, a partnership composed of T. L. Penn and H. B. T. Montgomery; and was commenced on the 14th October, 1889. The plaintiffs were manufacturers and wholesale dealers in flour, doing business in Gallatin and Nashville, Tennessee, and the defendants were merchants in Opelika, Alabama. The original complaint contained the common counts on an account, and for goods sold and delivered, each claiming $2,182.50. Two other counts were added by amendment, each claiming damages for the breach by the defendants of a contract for the purchase from the plaintiffs of a quantity of flour at specified prices; the first, for 300 barrels, one-half at $4.65, and the other half at $5.25, by contract made on the 15th April, 1889; and the other, for 150 barrels, at $4.65, by contract made on the 18th April, 1889. Each count alleged that, by the terms of the contract, the flour was to be delivered to the defendants, at Opelika, within a reasonable time; that plaintiffs had complied with all the stipulations of the contract on their part, but that defendants refused to receive and pay for it; wherefore plaintiffs suffered damages to the amount of $500, and also special damages on account of the difference in price obtained on a re-sale of the flour, and the expenses and loss of time incurred by one of their partners in coming out to Opelika to make the re-sale. The defendants objected to the allowance of the amendment, on the ground that it presented a new cause of action; and they also demurred to each count on the same ground, and specially to the claim of damages on account of the re-sale, expenses, loss of time, &c. The court overruled the objection and the demurrer, and the defendants then pleaded (1) the general issue, and (2) a special plea as follows: "(2.) For further answer to the whole complaint, and to each count thereof separately, defendants say that the only merchandise agreed to be purchased by them from plaintiffs was a lot of flour; that said flour was sold to them by plaintiffs by sample, and was subsequently to be shipped to them by plaintiffs; that a lot of flour was shipped to them by plaintiffs, which, on inspection thereof, defendants claimed did not come up to said sample, and notified plaintiffs thereof; and that plaintiffs thereupon took possession of said flour, and sold the same." The court sustained a demurrer to this plea, but overruled a demurrer to another special plea, which alleged that the flour delivered was in fact of a quality inferior to the sample, and was rejected by defendants on that account.

[Penn & Co. v. Smith, Grainger & Cantrell.]

The evidence adduced on the trial showed that there were two brands or grades of flour, known in the commercial world as *Patent* and *Straight*, the quality being denoted by the name or brand; that plaintiffs manufactured and sold each of these brands; and that there was a difference in the quality of the flour of the same name manufactured by different persons. In March, 1889, Smith, one of the plaintiffs, came to Opelika, exhibited his samples of flour to Montgomery, one of the defendants, "compared them with grades of flour then in their house, and offered to sell them flour of the grade of the samples;" but defendants declined to buy at that time. On April 10th, 1889, defendants sent a telegram to plaintiffs, at Gallatin, Tennessee, making an offer for a car-load of flour of each brand; but plaintiffs, in reply, refused the offer. On April 13th, defendants made another offer by telegraph, and that offer was accepted, plaintiffs' telegram in reply being dated April 16th. On April 18th, defendants ordered another car-load of flour by telegraph, and that order was accepted by plaintiffs, as shown by telegraph in reply, April 20th. The flour first ordered arrived in Opelika on the 29th April, and was rejected by the defendants, who at once sent a telegram to plaintiffs in these words: "Flour not up to grade we bought, and we reject same." Thereupon, Smith, one of the plaintiffs, at once come out to Opelika, and called at defendants' place of business, demanding to know whether they would accept and pay for the flour. Penn, one of the defendants, asked him to await the arrival of Montgomery, who was temporarily absent, and who had conducted the negotiations. Smith then gave written notice to defendants of his intention to re-sell the flour at their risk; and he did sell it a few days afterwards, at fifty cents per barrel less than the contract price.

"Montgomery testified, on the part of the defendants, that when Smith called and tried to sell them flour by sample, he instituted a comparison between said samples and flour they then had in the store of the same grades; that Smith then and there stated, if defendants would give his firm an order for flour, it should be as good as the sample then shown them; that he replied, they wanted no flour just then, but would communicate with them if he concluded to buy any." The bill of exceptions then adds: "Plaintiffs moved to exclude from the jury that part of the foregoing testimony relating to Smith's offer and Montgomery's response thereto. (No grounds were stated for the motion to exclude, and none were noted. *Carmichael.*) The court granted the motion, and excluded the evidence from the consideration of the jury, and the defendants duly excepted."

[Penn & Co. v. Smith, Grainger & Cantrell.]

The bill of exceptions does not purport to set out all the evidence, but it shows other exceptions reserved, some of which are not intelligible, though the transcript is in type-writing; as, for instance: "The evidence showed, without conflict, that the flour shipped to Opelika as aforesaid was selected by plaintiffs for shipment from larger lots of the same grades. (The exception on this evidence was given to plaintiff.— *Carmichael.*)"

The defendants requested the general charge on the evidence, and excepted to its refusal; and they also excepted to the following charges, which were given by the court on request of the plaintiffs:

(1.) "After an executory contract has been made, it may be converted into a complete bargain and sale by specifying the goods to which the contract is to attach, or, in legal phrase, by the appropriation of specific goods to the contract." (2.) "Under the terms of the contract proven in this case, if the seller was to separate the flour, and appropriate it to the contract, the appropriation was made when the flour was shipped by plaintiffs to defendants, if it be a fact, and the title to the flour passed to the defendants at that time." (5.) "All previous verbal stipulations are presumed to be merged in a written contract, and the defendants in this action can not, by parol evidence, alter, vary or contradict the terms or stipulations of the written contract." (7.) "If the evidence in this case satisfies the jury that the plaintiffs have complied with the terms of their contract as expressed in writing, then the plaintiffs should recover, and the jury should so find." (8.) "The conversation between plaintiffs and defendants in March, prior to the correspondence between them, can not be looked to, to alter or vary the written contract afterwards made between them, if one was so made." (9.) "The fact, if it be a fact, that the goods sent by the plaintiffs to defendants were not as good as some that Penn & Co. had in their store, will not defeat a recovery in this action, if said flour was of the grade ordered by defendants." (12.) "If the jury believe from the evidence that, after the interview between the plaintiffs and defendants, had in Opelika in March, 1889, and as a result thereof, the defendants declined or refused to buy from plaintiffs, and that after that conversation all the communication had between the parties relative to the purchase of the flour in controversy was by the letters and telegrams offered in evidence, then said contract of purchase is alone evidenced by said letters and telegrams." (13.) "The letters and telegrams in evidence show no guaranty on part of plaintiffs other than to furnish flour of the grade therein mentioned, and that it

480          SUPREME COURT          [Nov. Term,

should be merchantable and reasonably adapted to the purpose for which it was purchased." (14.) "If the jury believe from the evidence that plaintiffs shipped to defendants the grades of flour indicated in defendants' telegrams and letters, and the same was tendered to defendants in Opelika in good condition, and they refused to accept and pay for the same; then the plaintiffs are entitled to recover the amount of damages they sustained by reason of such refusal."

The rulings on the pleadings and evidence, and the charges given, are assigned as error.

JOHN M. CHILTON, and WM. J. SAMFORD, for appellants.

A. & R. D. BARNES, contra.

STONE, C. J.—We think there is no merit in the motion to reject the amended complaint. Each count is in assumpsit, those in the original complaint counting on a sale and delivery of merchandise, and those in the amended complaint setting up an agreement of sale, offer of delivery, and refusal by the purchaser to accept and pay. Each count is in contract, each seeks a money recovery, and we know of no rule of pleading which forbids that they should be joined in one and the same action.—2 Brick. Dig. 332–3, §§ 40, 43, 49, 51. And the demurrer for misjoinder was properly overruled.

Neither did the Circuit Court err in sustaining the demurrers to defendants' plea, numbered 2. It is no answer to the complaint.

There is a well and wisely established rule of law, that if parties conduct an oral negotiation looking to the making of a contract, and, reaching an agreement, reduce their contract to writing specifying its terms, then the contract becomes merged in the writing, and all previous negotiations not carried into it are treated as abandoned.—1 Greenl. Ev. § 275; 3 Brick. Dig. 417, § 156. That principle, however, has nothing to do with this case.

As we understand the testimony, Smith, Grainger & Cantrell, mill-men living in another State, proposed to sell and ship flour of certain named brands, at specified prices, to Penn & Co., merchants of Opelika. The brands proposed to be sold were designated as "Patent" and "Straight." The prices of the two brands were not the same. There was testimony tending to show that a sample of each brand of flour was produced, and the mill-men offered to sell flour that should be equal to the samples, and at a specified price for each brand. No agreement of sale and purchase was then consummated.

Soon afterwards, Penn & Co., by letter, ordered a car-load of each of the named brands of flour, at specified prices, to be paid for on delivery, and specifying nothing in reference to the quality of the flour, other than may be inferred from the brands, "*Patent*" and "*Straight*." When the flour reached Opelika, it was rejected by Penn & Co., on the alleged ground that it did not come up to the sample shown them when the offer of sale was made.

The foregoing appearing to be the undisputed facts in this case, we do not think the record presents any question of the merger of negotiations into a written contract. On the contrary, we hold that, as the testimony appears in this record, the true interpretation of the negotiation was, and is, an offer to sell as per sample, and that that offer was left open for acceptance by Penn & Co., should they elect to purchase. And when the latter firm gave the order to ship, it then became an agreement to purchase by sample. In such case, there is an implied warranty that the bulk shall correspond in quality with the sample.—Benjamin on Sales, pp. 446–7, § 969; Bish. Con. § 244; *Gachet v. Warren*, 72 Ala. 288. And if the flour shipped was not equal in quality with the sample which was made the basis of the negotiation, then Penn & Co. were justified in rejecting the flour. But, to justify such action on the part of Penn & Co., the inferiority of the flour as compared with the sample must have been real. It was not enough that they said, or believed it inferior. This was a question for the jury, and a pivotal question in the case. The Circuit Court erred in ruling out Montgomery's testimony.

The principles we have declared render inappropiate several rulings of the Circuit Court. Of this class are charges 1, 2, 5, 7, 8, 9, 12, 14. Charges 7 and 14 are positively erroneous, in the light of the testimony found in this record.

The proper issues before the jury in this case were, *first*, did the flour shipped correspond in quality with the samples? If it did not, defendants were entitled to a verdict. *Second*, if it was the equal of the samples, then plaintiffs should have a verdict for the injury they actually sustained, with interest. It was their duty to obtain the best price they could obtain per car-load on a re-sale, and if they did, their actual loss is the proper measure. They were required to act in good faith. They can not recover for the time and expense of the member of the firm who came to Opelika and made the sale.

Reversed and remanded.